JLM ENTERPRISES, INC. and Jerral
L. Mayes, Sr., Plaintiffs,

v.

HOUSTON GENERAL INSURANCE
COMPANY, Defendant.

No. CV 401–038.

United States District Court,
S.D. Georgia,
Savannah Division.

April 12, 2002.

Linda B. Foster, Weissman, Nowack, Curry & Wilco, PC, Atlanta, for dft represented by Foster.

Edward Mark Gilgor, Weissman, Nowack, Curry & Wilco, PC, Atlanta, for dft represented by Gilgor.

Patrick T. O'Connor, Oliver, Maner & Gray, Savannah, for pla represented by O'Connor.

Christopher L. Ray, Oliver, Maner & Gray, Savannah, for pla represented by Ray.

### ORDER

Before the Court are the parties' cross-motions for summary judgment (Docs. 24 and 30) and defendant's motion for filing of original discovery (Doc. 40). Defendant's motion for filing of original discovery is hereby GRANTED (Doc. 40). For the reasons set forth herein, plaintiffs' motion for summary judgment (Doc. 30) is DENIED and defendant's motion for summary judgment (Doc. 24) is GRANTED.

Plaintiffs JLM Enterprises, Inc. ("JLM") and Jerral L. Mayes, Sr. ("Mayes") entered into a commercial general liability policy ("CGL") with defendant Houston General Insurance Company ("Houston"). Plaintiffs sought the CGL insurance for JLM's business, which included an auto parts store, a gas station and a car wash. After purchasing the CGL, plaintiffs were involved in five separate lawsuits regarding wholesale transactions involving freon. In each of these lawsuits, plaintiffs tendered a defense to Houston. In each case, Houston refused to defend or indemnify. In the instant litigation, plaintiffs allege that in each of those five lawsuits defendant: (1) breached its duty to defend; (2) breached its duty to indemnify; and (3) acted in bad faith in refusing to defend or indemnify. Plaintiffs seek to be reimbursed for their attorneys' fees, costs, expenses and settlement amounts, and to recover an additional twenty-five percent as a bad faith penalty.

### SUMMARY JUDGMENT STANDARD

Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." FED. R. CIV. P. 56 advisory committee's note, cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is appropriate only when the pleadings, depositions, and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A court must view the evidence and any inferences that may be drawn from it in the light most favorable to the non-movant. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir.1997), cert. denied sub nom. Combs v. Meadowcraft Co., 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)).

The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Thompson v. Metro. Multi–List, Inc., 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991), cert. denied, 506 U.S. 903, 113 S.Ct.

295, 121 L.Ed.2d 219 (1992). Such a showing shifts to the non-moving party the burden "to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed R. Civ. P. 56(e)); *Thompson,* 934 F.2d at 1583 n. 16. A non-movant does not create a genuine issue of material fact by relying on "conclusory allegations based on mere subjective beliefs." *Plaisance v. Travelers Ins. Co.,* 880 F.Supp. 798, 804 (N.D.Ga.1994), *aff'd,* 56 F.3d 1391 (11th Cir.1995) (citing *Carter,* 870 F.2d at 585). Further, a "mere scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### BACKGROUND

The following material facts are undisputed. *See generally* Consolidated Stipulation of Material Facts.

JLM is a Georgia corporation with its principal place of business in Chatham County, Georgia. Mayes resides in Chatham County and is a former officer and employee of JLM. Houston is a Texas insurance company with its principal place of business in Fort Worth, Texas. Houston is authorized to do business in Georgia.

In 1993, JLM purchased a commercial general liability policy ("CGL") from Houston with a policy period of December 21, 1993 through December 21, 1994. The policy was renewed the next three years. The CGL provides that all statements in its Declarations are accurate and complete and are based upon representations made by JLM to Houston and that Houston issued the CGL in reliance upon JLM's representations. JLM's application for the CGL and the Declarations page reveal that the premium basis for the "Gas Station–Self Service" was $240,000; the premium basis for the "Auto Parts/Supply Stores" was $150,000; and the premium basis for the "Car Wash" was $10,000. JLM's application contains no express reference to the fact that JLM and/or Mayes had been brokering freon sales on the wholesale market prior to purchasing the CGL. Houston charged JLM $605, $574, $597 and $544 for the CGL, beginning in 1993 and continuing through the policy renewals.

In December 1994, Mayes brokered a wholesale transaction for a shipment of 30,000 pounds of freon. At that time, Mayes was working for both JLM and for White Brothers Auto Supply, Inc. ("White Brothers"). Aztec Brokerage, Inc. ("Aztec") was to purchase the freon from Thermo King Dealerships, Inc. ("Thermo King") in return for a payment of $165,000. Mayes was to receive a brokering commission of $15,000. Thermo King wired $165,000 to Aztec, but Aztec failed to deliver the freon to Thermo King. On February 7, 1995, Thermo King's agents traveled to Savannah, Georgia to meet with Mayes and demanded a return of the $165,000. Mayes did not return this money.

On June 24, 1997, Thermo King sued Mayes, White Brothers and Aztec in a suit styled *Williamson v. Thermo–King Dealerships, Inc. v. White Brothers Supply, Inc., et al,* 5–97–CV–502–BR(2) (E.D. N.C. June 24, 1997) (the *"Thermo King"* action). Mayes tendered the *Thermo King* action to Houston for a defense. Houston reviewed the *Thermo King* complaint and determined that it had no duty to defend because it concluded that there was no allegation of an occurrence that resulted in property damage. Houston informed Mayes of its conclusion.

In the fall of 1996, JLM, Discount Auto Parts ("DAP"), and Refrigeration Station, Inc. ("RSI") worked together to sell freon to Airgas, Inc., Airgas Management, Inc. and Airgas Specialty Gases, Inc. (collectively, "Airgas"). JLM or DAP would purchase the freon on the wholesale market and then sell the freon to RSI. As part of the arrangement with Airgas, RSI was to retain a certain amount of the freon at its own facility on Airgas' behalf and to ship certain amounts directly to various Airgas wholesale customers, including Autozone.

In two lawsuits[1], Airgas alleged that plaintiffs engaged in three separate schemes designed to defraud Airgas. First, Airgas claimed that plaintiffs sold it Freeze–12 designed as freon. Freeze–12 is a product that is substantially cheaper than freon and does not have freon's chemical characteristics. Second, Airgas alleged that plaintiffs sold it Canadian freon that had been imported illegally into the United States and for which no excise tax had been paid. Third, Airgas alleged that plaintiffs conspired with Davis, DAP, Morris and RSI, using false bills of lading, to induce Airgas to wire money for freon that never existed.

On February 19, 1997, plaintiffs tendered the two *Airgas* lawsuits to Houston for defense. Houston reviewed the claims and was unable to find a duty to defend because it concluded that there was no occurrence that resulted in property damage and because various exclusions rendered the *Airgas* claims uncovered. Houston therefore declined to defend plaintiffs in the *Airgas* actions.

On March 20, 1997, plaintiffs tendered to Houston for defense a cross-claim in the *Airgas II* lawsuit, in which William Morris and RSI claimed that any wrongdoing with which they were charged resulted from duress at the hands of their co-defendants. Houston reviewed the cross-claim and concluded that there was no duty to defend because the cross-claim was essentially identical to the claims in the *Airgas* suits. Houston therefore declined to defend plaintiffs.

On April 28, 1997, plaintiffs tendered for defense a counter-claim resulting from an action originally filed by plaintiffs against RSI in the case of *In re JLM Enterprises*, No. 96–43228–LWD, Adversary Case No. 97–04007A–LWD (Bankr.S.D.Ga.1997) (the "bankruptcy matter"). Houston reviewed the counter-claim and concluded that there was no duty to defend because the counter-claim was essentially identical to the claims in the *Airgas* suits. Houston therefore declined to defend plaintiffs.

Nationwide Insurance Company ("Nationwide"), the commercial general liability insurer for DAP, filed a declaratory judgment in this Court (Edenfield, J.) to determine its rights and duties under its policy with DAP. *Nationwide Property & Casualty Ins. Co., et al. v. Airgas, et al.*, CV497–167 (S.D.Ga.1997) (the *"Nationwide"* action). Nationwide named Mayes and JLM as defendants in the *Nationwide* action. Mayes and JLM tendered the *Nationwide* action to Houston for defense. Nationwide sought no damages in the *Nationwide* action, but rather sought an adjudication of the various obligations of the parties under DAP's insurance policy. Houston declined to defend Mayes and

---

1. *Airgas Specialty Gases, Inc. v. Refrigeration Station, Inc.; William Morris; J.L.M. Enters., Inc., & Jerral L. Mayes, Sr.,* Superior Court of Chatham County, Georgia, civil action No. CV96–1759–KA (1996) (*"Airgas I"*) and *Airgas, Inc., Airgas Mgmt., Inc., & Airgas Special-ty Gases, Inc. v. Discount Auto Parts, Inc. Brad Davis, JLM Enters., Inc. d/b/a/ Autoplex Parts, Jerral L. Mayes, Sr., William Morris & John Does, 1–100,* CV497–32 (S.D.Ga.1997) (*"Airgas II"*).

JLM because there were no sums sought as damages. Houston thus concluded that the *Nationwide* action was not covered under the CGL.

Mayes has admitted to brokering the $165,000 sale of freon between Aztec and Thermo King in 1994. Prior to such sale, Mayes brokered three other freon transactions for Thermo King. Mayes also admitted to purchasing for resale $1,557,360 of freon between October 4, 1996 and December 13, 1996. Mayes has admitted that plaintiffs' wholesale freon sales exceeded JLM's non-freon retail activities. Mayes also has pled guilty to a federal charge of illegally selling and importing freon.

Houston provided prompt attention to each of JLM's claims for coverage under the CGL. Houston processed each claim submitted by Mayes or JLM and denied each claim, asserting that there was no duty to defend under the CGL. JLM communicated with Houston through counsel on numerous occasions in an effort to ask Houston to re-assess its finding of no duty to defend. Each time, Houston reiterated its position that it was denying coverage in a timely fashion. Through counsel, JLM and Mayes requested that Houston review additional documents related to the underlying litigation matters in order to discern the "true facts." Houston reviewed the additional proffered material but found no facts that altered its original coverage determination.

As discussed above, the parties have stipulated that JLM's CGL application contains no express reference to the fact that JLM and/or Mayes had been brokering freon sales on the wholesale market prior to purchasing the CGL. The parties dispute whether plaintiffs otherwise informed Houston that their business included the wholesale brokering of freon and whether plaintiffs described their business in auto parts as a business in "retail" auto parts. As will be discussed below, while such disputed facts preclude a granting of summary judgment on the grounds of plaintiffs' alleged misrepresentations to Houston, such facts do not preclude a granting of summary judgment on other grounds.

## *ANALYSIS*

Under Georgia law, a duty to defend is separate and independent from an obligation to indemnify. *Elan Pharm. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir.1998). Although an insurer "need not indemnify an insured for a liability the insured incurs outside the terms of the insurance contract, an insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." *Id.* (citations omitted). To determine whether an insurer owes its insured a duty to defend a particular lawsuit, the Court must compare the allegations of the complaint, as well as the facts supporting those allegations, against the provisions of the insurance contract. *Id.* Although an insurer normally has no duty to investigate whether it has a duty to defend, *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Policy Nos. T031504670 & TO31504671*, 268 Ga. 561, 562, 491 S.E.2d 337, 338 (Ga.1997), Georgia law does not permit an insurer to rely on the allegations of the complaint to deny coverage when the facts that the insurer knows or can ascertain show that the claim is within the coverage of the policy. *Elan Pharm.*, 144 F.3d at 1376 n. 6. Under such circumstances, an insurer has a duty to conduct a reasonable investigation into the insured's contentions, and if the investigation reveals facts arguably placing the claim within the policy coverage, then the insurer would have a duty to defend. *Anderson v.*

*So. Guaranty Ins. Co.*, 235 Ga.App. 306, 308, 508 S.E.2d 726, 729 (Ga.App.1998).

Plaintiffs have moved for summary judgment on their claims that Houston: (1) breached its duty to defend; (2) breached its duty to indemnify; and (3) acted in bad faith while doing so. Houston has cross-moved for summary judgment on the grounds that: (1) plaintiffs made misrepresentations to Houston regarding its wholesaling of freon which preclude CGL coverage; (2) even if plaintiffs' wholesale transactions in freon potentially were covered under the CGL, there has been no "occurrence" causing "property damage" which would lead to a duty to defend or to indemnify; (3) even if there was an "occurrence" which led to "property damage," such occurrence was excluded from coverage under the CGL due to several policy exclusions; and (4) Houston at no time acted in bad faith.

The Court begins its analysis by considering plaintiffs' representations to Houston.

## I. Plaintiffs' representations to Houston and O.C.G.A. § 33–24–7(b)

As discussed above, JLM's CGL application contains no express reference to the fact that JLM and/or Mayes had been brokering freon sales on the wholesale market prior to purchasing the CGL. Houston has submitted an affidavit by Elizabeth Sessions, the underwriter who reviewed JLM's application ("Sessions"), in which Sessions testified that JLM never informed Houston that it was engaged in the wholesale brokering of freon and that such brokering was unknown to Houston. Aff. of Elizabeth Sessions at ¶ 7. Sessions further testified that if Houston had been aware of plaintiffs' wholesale brokering of freon, Houston either would have charged plaintiffs more for the CGL or would have refused to issue a CGL to plaintiffs alto-

gether. *Id.* at ¶¶ 8–16. Sessions testified that the sale of freon, a compressed gas, involves a risk different in quality and nature than the risk engendered in running of a service station with a retail auto parts store. *Id.* Sessions further testified that Houston based the CGL premiums upon JLM's projected annual sales and would have charged plaintiffs more for the CGL if it had been aware of the additional sales generated by the wholesale freon brokering business. *Id.* at ¶¶ 14.

While plaintiffs admit that they "may never have expressly informed [Houston] of the freon portion of their auto parts business" and that their CGL application did not expressly mention freon, plaintiffs nevertheless dispute that they made any misrepresentations about the nature of their business, including the wholesale freon sales. *See* Consolidated Stipulation of Material Facts at 21. Plaintiffs note that their application did not expressly mention *any* type of auto part and did not characterize their auto parts sales as "retail." *See id.* Plaintiffs also dispute that they made any misrepresentations about the income from their auto parts/supply stores. Although the CGL application includes a $150,000 figure with respect to auto parts/supply stores, plaintiffs argue that this figure did not necessarily represent gross sales, but may have represented another measure, such as net profit. *See* Pls.' Br. Opp. Deft's. Mot. Summ. J. (Doc. 35) at 5–6.

O.C.G.A. § 33–24–7, which governs the effect of misrepresentations upon recovery under insurance policies, provides as follows:

(a) All statements and descriptions in any application for an insurance policy or annuity contract or in negotiations for such, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties.

(b) Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:

(1) Fraudulent;

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

O.C.G.A. § 33–24–7. Houston contends that plaintiffs' alleged misrepresentations preclude recovery under the CGL because either: (1) they were material to the acceptance of the risk or to the hazard assumed by Houston; or (2) Houston, had it known the true facts, either would not have issued the CGL or would have charged more for it.

## A. Fact that plaintiffs dealt in freon

 Even accepting as true Sessions' testimony that plaintiffs did not expressly inform Houston of their wholesale dealings in freon and that Houston was unaware of such dealings, the Court cannot find as a matter of law that plaintiffs made any misrepresentations to Houston which would preclude recovery under § 33–24–7. At oral argument, Houston conceded that freon may be considered an "auto part." While the CGL application and policy refer generically to "auto parts," they contain no express reference to any particular auto part. Houston has offered no evidence which would suggest that plaintiffs informed it of their dealings in certain auto

parts but not in freon. Similarly, because Houston has presented no evidence of the types of auto parts that it purported to insure through the CGL, Houston has no basis for its suggestion that the risk involved in insuring freon was somehow greater than the risk involved in insuring such other, unspecified auto parts.

Although Houston has cited to several cases to support its argument that plaintiffs made material misrepresentations for the purposes of § 33–24–7, the Court finds such cases to be inapposite. *See Thompson v. Permanent Gen. Ass. Corp.*, 238 Ga.App. 450, 451, 519 S.E.2d 249, 250 (Ga. App.1999) (insured responded "none" to question of how many persons aged 14 or older lived in his household); *Jackson Nat'l. Life Ins. Co. v. Snead*, 231 Ga.App. 406, 410, 499 S.E.2d 173 (Ga.App.1998) (insured responded "no" to question of whether she had smoked cigarettes within the preceding twelve months); *Taylor v. Ga. Intern. Life Ins. Co.* 207 Ga.App. 341, 342, 427 S.E.2d 833, 834 (1993) (insured responded "no" to question of whether she had ever had heart or cardiovascular disease); *Bailey v. Interstate Life & Acc. Ins. Co.*, 155 Ga.App. 65, 66, 270 S.E.2d 287, 288 (Ga.App.1980) (insured responded "no" to question of whether he ever had "chest pains, high blood pressure, or other disease or disorder of heart or circulatory system"). In contrast to the cases relied on by Houston, there has been no evidence presented to the Court which would suggest that plaintiffs were asked to inform Houston of the particular auto parts in which they dealt and thereupon denied, or otherwise failed to mention, that they dealt in wholesale freon sales. The Court thus cannot conclude that plaintiffs' failure to inform Houston of its dealings in freon constituted a misrepresentation, omission, or concealment for the purposes of § 33–24–7.

Additionally, the parties have provided the Court with documents that present a genuine issue of material fact regarding whether plaintiffs described their auto parts business to Houston as strictly a "retail" business. Although Sessions has testified that plaintiffs "failed to inform [Houston] that [they were] engaged in the business of brokering Freon sales on the wholesale market," both parties have presented copies of CGL-related documents which refer to plaintiffs' auto parts business with no limitation of "retail" sales. *See* Sessions Aff. at 7. Houston has presented a mostly-typed copy of a declarations page which refers to "Auto Parts/Supply Stores." *See* document bates-numbered 0000043. Plaintiffs have presented a different copy, written in by hand, which refer to "Auto Parts Sales." *See* document bates-numbered 0000030. Houston has presented a fully-typed, supplemental declarations page which refers to "Automobile Parts and Supplies Stores," again with no limitation of "retail" sales. *See* document bates-numbered 0000225. Finally, plaintiffs have presented a CGL application document, mostly written by hand, in which the description "retail auto parts" appears to have been crossed through. *See* document bates-numbered 0000025. Although the parties were able to offer the Court little information about who wrote on these documents, or when they were created, the Court nevertheless finds that these documents are sufficient to create a genuine issue of material fact regarding plaintiffs' representations to Houston regarding the nature of plaintiffs' auto parts business.

## B. Plaintiffs' income from their freon sales

Houston seeks summary judgment under § 33–24–7 not only on the grounds that plaintiffs misrepresented the nature of their business dealings, but also on the grounds that plaintiffs misrepresented the annual income generated by their freon sales. The parties have stipulated that both the CGL application and declarations page reveal that the premium basis for the gas station-self service was $240,000; the premium basis for auto parts/supply stores was $150,000; and the premium basis for the car wash was $10,000. Houston argues that the $150,000 auto parts/supply stores figure represents plaintiffs' gross sales. Accordingly, Houston argues that given Mayes' admissions of brokering a $165,000 sale of freon to Thermo King in December 1994, brokering three prior freon sales to Thermo King (of unspecified amount), and purchasing for resale more than $1.5 million dollars' worth of freon between October 4, 1996 and December 13, 1996, plaintiffs materially misrepresented the gross sales stemming from their auto parts business.

At oral argument, plaintiffs offered into evidence a copy of a handwritten CGL application document in which the code letter "(s)" to specify "gross sales" does not appear next to the $150,000 auto parts/supply stores figure. *See* document bates-numbered 0000030. Based on this document, plaintiffs argue that the $150,000 may have represented another measurement of income, such as net profit. Plaintiffs conceded that they had no evidence regarding who wrote this document, or when. Houston has presented a different, typed copy of the declarations page. *See* Sessions Aff. at ¶ 6 and Ex. C thereto. On Houston's copy, the premium basis for auto parts/supply stores is indicated solely as "$150,000." *See* Ex. C to Sessions Aff. No reference is made to what this figure purports to represent. Houston also has presented a typed "supplemental declarations" page. *See* Ex. A. to Sessions Aff. The supplemental declarations page, dated December 21, 1996, indicates that the

$150,000 premium basis for auto parts/supply stores is for gross sales. *See id.*

■ On a motion for summary judgment, it is not a district court's job to weigh the evidence, but rather to determine if a genuine issue of material fact exists. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir.2000) ("In evaluating a motion for summary judgment under Rule 56(c), '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' ... Moreover, the court must avoid weighing conflicting evidence or making credibility determinations.") (citations omitted). Construing the evidence in the light most favorable to plaintiffs, the Court finds that the copies of the declarations and supplemental declarations pages create a genuine issue of material fact regarding what measure of income the $150,000 figure purports to represent. One copy of the declarations page does not indicate what the $150,000 auto sales figure purports to measure. Another copy suggests that the $150,000 figure does not represent gross sales. A supplemental declarations page, apparently created at a later date, indicates that the $150,000 figure does, in fact, represent gross sales. The Court concludes that a genuine issue of material fact exists with respect to plaintiffs' representations regarding their annual auto parts income. Such factual issue precludes the Court from granting summary judgment to Houston under § O.C.G.A. 33-24-7. Accordingly, the Court proceeds to examine the terms of the CGL policy.

## II. CGL provisions, underlying allegations and "true facts"

The CGL defines "property damage" as either: (1) physical injury to tangible property, including all resulting loss of use of that property; or (2) loss of use of tangible property that is not physically injured. CGL § V–15.[2] Property damage is covered under the CGL only if such damage: (1) is caused by an "occurrence" that takes place in the coverage territory; and (2) occurs during the policy period. *Id.* at § I–A–1–b. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at § V–12.

Similarly, the CGL defines "advertising injury" in pertinent part as injury arising out of "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." *Id.* at § V–1. Advertising injury is covered under the CGL only if it is caused by an offense committed in the course of advertising [insured's goods], products or services. *Id.* at § I–B–1–b.

Lastly, the CGL defines "personal injury" in pertinent part as any injury other than bodily injury arising out of oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services. *Id.* at § V–13. Personal injury is covered only if it is caused by an offense arising out of the insured's business, excluding advertising, publishing, broadcasting or telecasting done by or for the insured. *Id.* at § I–B–1–b.

The CGL further provides that Houston will "pay those sums that the insured becomes legally obligated to pay as damages because of" property damage, personal injury and advertising injury "to which this

---

**2.** The parties have provided the Court with a complete and accurate copy of the CGL, which has been bates stamped with numbers 0000259 through 0000270. The Court refers herein to relevant portions of such document.

insurance applies" and will "have the right and duty to defend any 'suit' seeking those damages." *Id.* at §§ I–A–1–a and I–B–1–a.

The Court now considers whether the underlying complaints allege an occurrence caused by property damage or an offense of personal injury or advertising injury as defined in the CGL.[3] Although some of the claims in the underlying complaints are brought against entities and individuals other than JLM and Mayes, the Court considers only those allegations which implicate JLM and/or Mayes.

## A. Underlying Allegations

### 1. *Thermo King*

Thermo King alleged that JLM and Mayes breached a contract to sell 30,000 pounds of freon to Thermo King, Pls.' Ex. 12 at ¶¶ 26–30, and either made fraudulent misrepresentations to Thermo King regarding the sale of such freon, *Id.* at ¶¶ 46–54, or, alternatively, made negligent misrepresentations to Thermo King regarding the sale of such freon. *Id.* at ¶¶ 55–59. Thermo King further alleged that JLM and Mayes' alleged actions constituted unfair and deceptive trade practices under North Carolina law. *Id.* at ¶¶ 60–62.

■ The Court finds that Thermo King did not allege any offenses of personal injury or advertising injury as there was no allegation of libel, slander or a publication that disparages a person's or organization's goods, products, or services. Additionally, as the crux of Thermo King's complaint is that JLM and Mayes fraudulently or negligently induced Thermo King to enter a contract for the sale of freon which JLM and Mayes then breached, Thermo King does not allege an accident which caused physical injury to tangible property or loss of use of tangible property that was not physically injured. Instead, Thermo King alleged that because of the actions of JLM, Mayes and others, Thermo King was injured because it did not receive the freon for which it had bargained. Accordingly, the *Thermo King* allegations do not include allegations of property damage, personal injury or advertising injury under the terms of the CGL.

### 2. *Airgas I and II*

The *Airgas* plaintiffs alleged that JLM and Mayes supplied them with canisters which supposedly contained freon but actually contained a different substance ("Freeze–12"), that JLM and Mayes provided illegally imported freon and, through false bills of lading, purported to sell other freon which did not actually exist. Pls.' Ex. 5 at ¶¶ 3, 5; Pls.' Ex. 7 at ¶¶ 61–118. Specifically, the *Airgas* plaintiffs alleged that JLM's and Mayes' alleged acts constituted RICO violations, violations of O.C.G.A. 16–14–4(a) and (c) ("Georgia RICO"), conspiracy to defraud by selling counterfeit freon, conspiracy to defraud by selling smuggled freon, tortious interference with contract, constructive trust, aiding and abetting fraud by selling counterfeit freon, aiding and abetting fraud by selling smuggled freon, aiding and abetting fraud by falsifying bills of lading, and violations of Florida Statute Ann. 812.012–812.037. *See generally* Pls.' Ex. 7 at ¶¶ 119–306. In his cross-claim, William Morris alleged that any of his actions which were at issue in the *Airgas* cases were taken at the direction of the wilfull and wanton actions of his co-defendants, including JLM and Mayes. *See generally* Pls.' Ex. 8.

---

**3.** The Court refers in this section to exhibits to plaintiffs' motion for summary judgment.

■ The *Airgas* complaints and cross-claim do not allege personal injury or advertising injury as they clearly do not allege libel, slander or a publication disparaging a person's or organization's goods, products, or services. The Court also finds no allegations of any occurrences arising from property damage. The *Airgas* plaintiffs do not allege an accident causing physical injury to tangible property or loss of use of physical property that was not physically injured. Rather, the *Airgas* plaintiffs allege that, because of the actions of JLM, Mayes and others, the freon they purchased either was not delivered at all or was not delivered as specified-either because it was imported illegally into the United States or because it was a substance other than freon. Moreover, both the *Airgas* plaintiffs and cross-claimant William Morris allege that JLM and Mayes' actions were intentional and willful. *See id.* at ¶¶ 141, 154, 169,170, 177, 178, 191, 192, 201, 210, 211, 220, 221, 229, 230, 240, 241, 295, 300, 301 and 302. Accordingly, under the terms of the CGL, such alleged intentional acts cannot be "occurrences" as they cannot reasonably be construed to be "accidents."

While JLM and Mayes repeatedly direct the Court to the *Airgas* plaintiffs' tortious interference claim as proof that the underlying allegations cannot all be characterized as stemming from a breach of contract, the Court finds that even the tortious interference claim does not allege personal or advertising injury or an occurrence giving rise to property damage. In their tortious interference claim, the *Airgas* plaintiffs alleged that JLM, Mayes and others intentionally and wilfully interfered with the contractual relationship between Airgas and RSI by prompting RSI to ship counterfeit and illegally imported freon and to use false and fictitious bills of lading to induce Airgas to wire money for freon that cannot be accounted for. The

Court finds that the *Airgas* plaintiffs have not alleged that accidents led to "physical injury to tangible property or loss of use of physical property" but rather have alleged that, because of intentional actions of JLM, Mayes and others, they did not receive the freon for which they bargained.

### 3. *Nationwide*

As the *Nationwide* action was a declaratory judgment action, Nationwide alleged no "occurrence" or accident causing property damage no personal or advertising injury under the terms of the CGL. *See* Pls.' Ex. 10. Instead, Nationwide sought an adjudication of its responsibilities with respect to its insured under the terms of an insurance policy. Moreover, the cases which gave rise to the *Nationwide* action are *Airgas I* and *II*. As the Court has already discussed, the allegations in the *Airgas* cases did not constitute property damage, personal injury or advertising injury under the CGL policy.

### 4. **Bankruptcy Action**

■ In their counterclaim against JLM, RSI and the bankruptcy trustee alleged that JLM acted in bad faith in the performance of its supply agreement with RSI because JLM: (1) failed to supply RSI with 40,000 canisters of freon for which RSI had paid; (2) provided RSI with ten boxes which were supposed to contain canisters of freon but were empty; (3) provided RSI with canisters which were represented to contain freon but actually contained a different substance; and (4) provided RSI with 588 canisters of freon that were confiscated by the United States Customs Service. Pls.' Ex. 13 at pages 5–9. As with the other cases discussed above, the Court finds that the crux of the allegations against JLM (and Mayes) is that because of the actions of

JLM, RSI did not receive the freon for which it had bargained. Accordingly, the counterclaim does not indicate an "occurrence" giving rise to property damage or an offense of personal injury or advertising injury under the terms of the CGL.

Under Georgia law, "a party claiming coverage under an insurance policy has the burden of proving that the claim is covered by the policy." *Planters & Citizens Bank v. Home Ins. Co.*, 786 F.Supp. 977, 982 (S.D.Ga.1992) (citations omitted). The Court finds that, as a matter of law, plaintiffs have failed to prove that CGL coverage, and thus a duty to defend or indemnify, arose out of the allegations made in the five underlying cases. No personal or advertising injury coverage exists because none of the allegations implicate libel, slander or a publication that disparages a person's or organization's goods, products, or services. With respect to property damage, CGL coverage is contemplated only upon an occurrence. Conceding that, under the terms of the CGL, an occurrence must be an "accident," plaintiffs attempt to define "accident" without limitation as "an unexpected and undesirable event." Insurance contracts, however, "are to be construed in accordance with the reasonable expectations of the insured," *Anderson v. So. Guaranty Ins. Co.*, 235 Ga.App. 306, 309, 508 S.E.2d 726, 730 (1998), and unambiguous terms of an insurance contract are to be understood in their "plain, ordinary, and popular sense." *Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1376–77 (11th Cir.1998) (citing *Horace Mann Ins. Co. v. Drury*, 213 Ga.App. 321, 322, 445 S.E.2d 272, 274 (Ga.App.1994)). The Court finds plaintiffs' construction of the CGL's term "accident" to be unreasonable and not to comply with the word's plain meaning. The plain meaning of "accident" as used in the CGL clearly does not contemplate the failure to deliver goods as promised due to the substitution of Freeze–12 for freon, the provision of empty boxes in place of boxes containing freon, or the provision of illegally imported freon.

Finding that the underlying allegations do not give rise to CGL coverage, the Court next considers plaintiffs' arguments that Houston nevertheless breach its duty to defend because the "true facts" not apparent from the complaints indicated CGL coverage.

## B. "True facts" not apparent from the complaints

When a "complaint on its face shows no coverage, but the insured notifies the insurer of factual contentions that would place the claim within the policy coverage ...the insurer has an obligation to give due consideration to its insured's factual contentions and to base its decision on "true facts" .... The requirement that an insurer base its decision on true facts will necessitate that the insurer conduct a reasonable investigation into its insured's contentions." *Colonial Oil Indus. v. Underwriters Subscribing to Policy Nos. T031504670 & TO31504671*, 268 Ga. 561, 562, 491 S.E.2d 337 (1997) (citations and footnotes omitted). Plaintiffs claim that Houston breached its duty to defend by failing to investigate the "true facts" of the five underlying lawsuits, facts which plaintiffs contend demonstrate CGL coverage. Specifically, plaintiffs claim that although Houston had knowledge that plaintiffs "disagreed with, challenged, or otherwise controverted various portions of the claims against them," Houston did not investigate the true facts of the five underlying lawsuits. Pls.' Mot. Summ. J. at 13.

Plaintiffs explain that the "true facts" are that "JLM and Mayes were sued for business torts sustained by some of the

parties with which they were conducting trade in Freon. These business tort claims were predicated upon 'occurrences' " in the form of property damage, personal injury or advertising injury under the terms of the CGL. *See* Pls.' Reply Br. (Doc. 44) at 2–3. Plaintiffs, however, do not inform the Court of what such occurrences were, other than to point the Court to the fact that plaintiffs apparently entered a settlement agreement in the *Airgas* litigation, in which one allegation was for tortious interference with contract. *See id.* at 3. As the Court stated at oral argument, lawyers' characterizations in private agreements are of no consequence to the Court. As discussed above, the Court finds that none of the allegations in the *Airgas* cases constituted occurrences under the CGL policy. The Court is not moved by the fact that plaintiffs or third parties may have reached a different conclusion.

Moreover, Houston has presented evidence that it not only investigated whatever facts plaintiffs offered but also asked plaintiffs repeatedly to provide additional facts if any were available. Plaintiffs have stipulated that Houston reviewed all additional documents presented by plaintiffs to illustrate the "true facts" but, despite such review, found that none of the additional facts altered its coverage determination. Houston has offered uncontroverted testimony to the effect that it retained coverage counsel who performed a second coverage opinion when new facts and documents became available. *See* Rule 30(b)(6) Dep. of Houston General Insurance Co. at 21, 40; Aff. of David Bourneuf at ¶¶ 3–4.

Through counsel, Houston set forth its understanding of the facts giving rise to the underlying complaints and requested that if plaintiffs believed that Houston misunderstood such facts, or if plaintiffs became aware of additional facts which would impact Houston's coverage decision, plaintiffs advise Houston immediately so that Houston could consider such facts. *See* Ex. 3 to Houston's Reply Br. Rather than offering additional information, however, plaintiffs merely tried to put the ball back into Houston's court. *See* Ex. 4 to Houston's Reply Br. ("If [Houston] believes it requires additional facts with which to evaluate our demand for indemnity and defense, please advise."). Such tactic is not sufficient to meet their burden of notifying Houston of factual contentions.

In support of their contention that defendants improperly failed to investigate the true facts, plaintiffs rely on two cases, *Anderson v. So. Guaranty Ins. Co.*, 235 Ga.App. 306, 508 S.E.2d 726 (1998), and *Colonial Oil,* 268 Ga. 561, 562, 491 S.E.2d 337 (1997). The Court finds that neither of these cases support plaintiffs' position. In *Anderson,* an insured was sued, among other things, for assault, battery and false imprisonment arising out of a physical altercation with another woman. 235 Ga. App. 306, 508 S.E.2d 726. The insured was alleged to have entered a bus, kicked a woman, struck her with a cane and dragged her off the bus, causing physical injuries. The insured contended, however, that she did not strike or kick the other woman, that she grabbed the woman's foot only out of self defense and that the other woman either tripped or fell out of the bus. *Id.* at 307, 508 S.E.2d 726. Based on the insured's factual contentions, the Court of Appeals affirmed the lower court's determination that a duty to investigate arose and that summary judgment was not appropriate. *Id.* at 306, 308, 508 S.E.2d 726.

Similarly, in *Colonial Oil,* the Georgia Supreme Court affirmed a lower court's determination that a duty to investigate arose when an insured, who was sued because certain dredge material allegedly

contained "waste" and "pollution," informed its insurer that the dredge material in fact did not contain either waste or pollution. *Colonial Oil,* 268 Ga. at 563, 491 S.E.2d at 339. Unlike the insureds in *Anderson* and *Colonial Oil,* and despite Houston's repeated requests for additional relevant facts, plaintiffs presented no alternative factual scenario giving rise to a duty to investigate. Rather, plaintiffs presented an alternative legal interpretation of the CGL provisions based on the relevant facts already available to Houston.

■ Because Houston performed a reasonable investigation into the limited information offered by plaintiffs and actively sought more information from plaintiffs, Houston did not breach its duty to defend by failing to investigate. The Court thus concludes that summary judgment for Houston is appropriate because, based upon both the allegations in the underlying lawsuits and the additional facts put forth by plaintiffs, no CGL coverage existed. Houston therefore was not obligated to defend and is not obligated to indemnify plaintiffs with respect to any of the five underlying lawsuits.

### III. Houston's Alternative Summary Judgment Arguments

Despite finding that summary judgment for Houston is appropriate because no CGL coverage arose out of the allegations in the underlying lawsuits or the "true facts" presented by plaintiffs, the Court nevertheless considers Houston's alternative argument that summary judgment is appropriate because even if the events giving rise to the five underlying cases could be considered "occurrences" giving rise to property damage, CGL coverage neverthe-

less did not exist due to the CGL's "impaired property" exclusion.[4]

The CGL provides in pertinent part that its insurance does not apply to "property damage" to "impaired property" or property that has not been physically injured arising out of: (1) a defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or (2) a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms. CGL § I–A–2–m. "Impaired property" is defined as tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

*Id.* at § V–7.

"Your product" is defined in pertinent part as "(a) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (1) You; (2) Others trading under your name; or (3) A person or organization whose business or assets you have acquired; and (b) Containers (other than vehicles) materials, parts or equipment furnished in connection with such goods or products." *Id.* at § V

---

**4.** The Court does not consider Houston's additional alternative arguments that summary judgment is appropriate due to the CGL's

"your product" or "recall" exclusions or plaintiffs' alleged failure to comply with the CGL's notification provisions.

Houston contends that the underlying cases arose because JLM and Mayes did not fulfill the terms of their brokering agreements, and that, accordingly, any alleged property damage was damage to "impaired property" and thus excluded from CGL coverage. The Court agrees. To the extent that the delivery of Freeze–12, empty boxes or illegally imported freon, or the failure to deliver freon at all, can be considered to have caused "property damage," such damage was caused by plaintiffs' failure to fulfill the terms of their brokerage agreements, and was thus damage to "impaired property." Accordingly, the Court finds that even if any of the events giving rise to the underlying litigation could be considered "occurrences" giving rise to "property damage," the "impaired property" exclusion would preclude CGL coverage. Houston therefore had no duty to defend or indemnify plaintiffs with respect to such cases.

## IV. Bad Faith Denial

Plaintiffs argue that Houston refused to defend or indemnify them in bad faith and that bad faith penalties are therefore appropriate pursuant to O.C.G.A. § 33–4–6. Houston argues that it did not act in bad faith because it examined all information provided by plaintiffs to look for coverage, responded in a timely fashion to every communication it received from plaintiffs and declined to defend in each case in a timely fashion.

To support a cause of action under O.C.G.A. § 33–4–6, the insured bears the burden of proving that the refusal to pay the claim was made in bad faith. *So. Fire & Cas. Ins. Co. v. Northwest Ga. Bank*, 209 Ga.App. 867, 867, 434 S.E.2d 729, 730 (Ga.App.1993) (citations omitted). Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim. *Id.*

As discussed herein, Houston had reasonable grounds to contest plaintiffs' claims for coverage. The allegations in the underlying lawsuits, and true facts giving rise thereto, did not implicate a covered event under the CGL policy. Moreover, even if such allegations or facts had implicated "property damage" under the terms of the policy, the "impaired property" exclusion would have served to preclude coverage. Accordingly, the Court GRANTS Houston's motion for summary judgment on the issue of bad faith penalties and DENIES plaintiffs' motion for summary judgment thereon.

## V. Conclusion

The Court hereby GRANTS Houston's motion for summary judgment (Doc. 24) on plaintiffs' claims for breach of duty to defend and indemnify on the alternative grounds that: (1) neither the allegations made by parties to the underlying actions nor the "true facts" have given rise to "property damage," "advertising injury" or "personal injury" under the terms of the CGL; and (2) even if an "occurrence" giving rise to "property damage" had existed, CGL coverage would have been precluded due to the "impaired property" exclusion. The Court further GRANTS Houston's motion for summary judgment (Doc. 24) on plaintiffs' claims for bad faith penalties. The Court DENIES plaintiffs' motion for summary judgment (Doc. 30) in its entirety.

So ORDERED.